# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### September 9, 2009 Session

## MARK A. SCHIEFELBEIN v. STATE OF TENNESSEE

### Direct Appeal from the Circuit Court for Williamson County
#### No. CR033365    Robbie Beal, Judge[1]

---

### No. M2008-02467-CCA-R3-PC - Filed May 19, 2010

---

A Williamson County jury convicted the petitioner, Mark A. Shiefelbein, of seven counts of aggravated sexual battery and one count of especially aggravated sexual exploitation of a minor.  The trial court sentenced him to ninety-six years in the Tennessee Department of Correction.  The petitioner appealed, and this court affirmed his convictions but modified his sentence to thirty-two years.  The petitioner filed for post-conviction relief, arguing that he received ineffective assistance of counsel during his trial.  Specifically, the petitioner contends that trial counsel's performance was deficient because he (1) did not object when the trial court ordered the spectators to move so they could not see the presentation of video evidence; (2) did not object when the trial court ordered that part of the defendant's testimony be stricken from the record; (3) did not obtain a copy of the audio-taped conversation between the petitioner and the victim, object to the recording's admission as evidence, or properly prepare the petitioner for cross-examination about the recording; (4) did not properly object or move for a mistrial during the state's cross-examination of the petitioner; (5) did not lay a proper foundation for the admission of expert testimony; (6) did not object to the trial court's questioning of state witnesses; (7) did not seek an extraordinary appeal when the trial court refused to compel the state to provide copies of videotape evidence; and (8) did not object to the state's use of the term "vaginal shots."  Additionally, the petitioner avers that the cumulative effect of trial counsel's deficient performance rendered his trial unfair.  The post-conviction court denied relief.  After review, we affirm the post-conviction court's denial of relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

---

[1] The trial judge recused himself from the post-conviction proceedings, and the Honorable Robbie Beal substituted.

J.C. McLIN, J., delivered the opinion of the court, in which JERRY L. SMITH and NORMA McGEE OGLE, JJ., joined.

G. Jeff Cherry and David H. Veile, Lebanon, Tennessee, for the appellant, Mark A. Schiefelbein.

Robert E. Cooper, Jr., Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; Kim R. Helper, District Attorney General; and Mary Katherine White, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

I. Background

In 2002, a Williamson County grand jury indicted the petitioner on three counts of child rape, seven counts of aggravated sexual battery, and one count of especially aggravated exploitation of a minor. *State v. Schiefelbein*, 230 S.W.3d 88, 97 (Tenn. Crim. App. 2007), *perm. app. denied* (Tenn. 2007). On the first day of trial, the trial court severed the three child rape counts on the state's motion. *Id.* After the close of proof and deliberations, the jury found the defendant guilty of seven counts of aggravated sexual battery and one count of especially aggravated exploitation of a minor. *Id.* at 97. The following evidence, taken in the light most favorable to the state, was presented at trial.

B.R.,[2] born June 15, 1990, practiced gymnastics at Let It Shine Gymnastics in Franklin, Tennessee, where she was coached by the [petitioner]. When the [petitioner] opened his own gymnasium, Esprit Gymnastics,[3] in late 2000, B.R. and five other female students left Let It Shine Gymnastics to continue under the [petitioner]'s tutelage. The [petitioner] referred to these 6 students as his "six pack."

B.R. testified that she was the [petitioner]'s "favorite" student, and he developed a close social relationship with B.R.'s family. He regularly joined them for dinner, movies, hockey games, holidays, and church services. The [petitioner] received Christmas and birthday presents from the victim's family, and he bought presents for B.R., her mother, and her younger sister. B.R.

---

[2] To protect the identity of minor victims of sex crimes, it is the policy of this court to refer to the victims by their initials.

[3] The trial transcripts incorrectly refer to Esprit Gymnastics as "Espirit Gymnastics." We will use the correct spelling "Esprit."

testified that she had received other gifts from the [petitioner], and her fellow students "start[ed] not liking [her] and it made [her] sad."

During the summer of 2001, B.R. practiced gymnastics five days a week, and the following school year, she practiced four days a week. Typically, B.R. would wake at 6:15 a.m., and she would attend school from 8:30 a.m. until 3:15 p.m. Afterwards, she would practice gymnastics for approximately five hours, until approximately 9:00 p.m. when she would go home, complete her homework, and retire to sleep at 11:00 p.m.

The [s]tate's evidence showed that all of the charged offenses occurred during B.R.'s practice sessions at the gymnasium between the summer of 2001 and September of 2002. Evidence described Esprit Gymnastics's gymnasium and office layouts. The victim testified that the [petitioner] touched her vagina while she was stretching on the "regular" floor[4] and on the rod floor, and he touched her breasts and made her touch his penis while they were in his office. B.R. explained that the majority of the touching took place on the rod floor. The rod floor is approximately one foot higher than the concrete regular floor, and carpet separates it from the concrete. B.R. said, "[I]t's . . . a strip of floor[,] and it is very bouncy and easier to tumble on." B.R. and other [s]tate witnesses testified that a cabinet stood in an opening in the office wall.[5] From the parent-viewing area, individuals could see into the office through this opening if they leaned over the cabinet. The office also had a door.

B.R. stated that six to seven other students were present without their parents when the [petitioner] touched her. The [petitioner] stretched the students in a certain order, and he stretched them behind a purple and white mat. In the beginning, the [petitioner] stretched B.R. first, but then he started stretching her last. She explained that on some occasions, he would stretch her twice, before and after the other students. She stated that the [petitioner] would touch her after he stretched the other students and while the other students performed exercises on the bars and the trampolines.

---

[4] We glean from the record that the "regular" floor is the large floor marked with boundary lines where gymnasts perform tumbling and floor exercises.

[5] B.R. testified that this opening was "patched . . . up." During the [petitioner]'s proof, Rob Tallman, a home builder, testified that the [petitioner] asked him in June of 2002 to fill in the opening. He stated that in late August or early September the [petitioner] enclosed the opening and asked him to finish the drywall.

B.R. recounted that the [petitioner] first touched her vagina, over her leotard, while she was doing a frog stretch.[6] He pressed his hand onto her buttocks during the stretch and placed his fingers between her legs, onto her vagina. B.R. gave various estimates of the number of times she was touched. At trial she testified that the [petitioner] touched her in this fashion over her leotard eight to 10 times. B.R. also stated that he touched her under her leotard during this stretch "a bunch of times." She recalled telling Brentwood Police Department Detective Adrian Breedlove, the case's lead detective, that the [petitioner] had touched her vagina under her leotard approximately 30 times. She explained at trial that she was "distraught" during the interview with Detective Breedlove, and the [petitioner] touched her under her leotard 15 to 17 times.

The [petitioner] also touched B.R.'s vagina and had her pull aside her leotard during the straddle stretch[7] while she was training for level seven[8] competitions. She testified that the [petitioner] told her that he needed to see her vagina so he would know where not to touch her. B.R. complied because the [petitioner] "gets really mad very easily." After she would pull her leotard aside, he then asked to touch her vagina to determine how it felt, so he would not touch her again. B.R. stated that she allowed him to touch her "[b]ecause he would get angry and [she] was his favorite and [she] didn't want him angry at [her]." B.R. and the [petitioner] would then negotiate how many seconds he could touch her vagina, but he would count very slowly to extend the actual touching time. B.R. testified that he touched her with his "pointer finger," and she mimicked his finger's movement for the jury.

During the straddle stretch, the [petitioner] would ask B.R. to rate on a scale of one to 10 how the touching made her feel. At first, B.R. told the

---

[6] We discern from the record that for a frog stretch, a gymnast lies on his or her stomach and puts his or her feet together. The knees splay to each side of the body, and the goal is for the entire body to be flat against the floor. B.R. demonstrated this stretch for the jury.

[7] We discern that for a straddle stretch, a gymnast sits with his or her legs in a V-shape. The goal of this stretch is to have the legs wide and straight to the floor. B.R. also demonstrated this stretch for the jury.

[8] B.R.'s mother testified that B.R. began training for level seven in the summer of 2001. B.R. testified that the sport of gymnastics is organized into 10 levels. Gymnasts begin competing at level four, and as they master harder skills, they compete at higher levels. The elite level exceeds the tenth level, and at this stage, gymnasts possess the skills necessary to compete in the Olympic Games.

[petitioner] "zero because it didn't feel good to [her]. It made [her] feel violated." When the [petitioner] accused her of lying, she provided a number to prevent him from becoming angry. B.R. explained that the [petitioner] touched her vagina "basically every time" she did the stretch.

B.R. testified that the [petitioner] routinely videotaped the students' "tricks," and he videotaped B.R.'s vagina twice while she did the straddle stretch. On the first occasion, he told B.R. that he had an idea that she would hate. Then he asked her if he could videotape her vagina, and she "finally gave in because [she] didn't like him being angry at [her]." The [petitioner] directed B.R. to pull aside her leotard, and he placed the camera on the rod floor, positioned it in front of her, and videotaped her vagina. After this first videotaping, the [petitioner] claimed that the previous tape "didn't turn out" and that he needed to videotape her a second time. He told B.R. that he needed to move her leotard. At first, she refused, but eventually, she pulled her leotard aside. After she moved her leotard, the [petitioner] adjusted its position, and B.R. held it in place. The [petitioner] placed the camera on the rod floor and videotaped himself touching B.R.'s vagina. She testified that his finger was "shaky." Sometime later, the [petitioner] assured B.R. that he had destroyed these videotapes. He told her that he burned the film in a tuna can, and he smashed the remaining plastic parts with a hammer. He then threw the tuna can and the plastic in the trash.

After Thanksgiving of 2001, the [petitioner] made B.R. touch his penis twice in the same day. B.R. stated that these incidents occurred in the winter because she remembered the [petitioner] wearing "black squishy pants," and he only wore long pants in the winter. She remembered telling Detective Breedlove that the [petitioner] wore "quilted shorts" when this occurred, but she testified at trial that now she "remember[s] clearly it was black pants." First, while near the uneven bars, the [petitioner] asked B.R. to put her hand in his pocket because he had a "treat" for her. She refused, but later, while in his office, he made B.R. put her "hand in his pocket and squeeze his penis." The second time the [petitioner] made B.R. touch his penis was later that same day. After he went to the restroom, he went to his office and called for B.R. She testified that she did not want to go into his office "because [she] thought something like that was going to happen." When she entered the office, the [petitioner] exposed his penis. B.R. turned her head, and the [petitioner] said, "You can touch it and squeeze it." B.R. told the [petitioner] that she did not want to touch his penis, but he grabbed her hand and made her touch it. She demonstrated for the jury the motion that the [petitioner] instructed her to

make. She stated that the [petitioner]'s penis looked "swollen," "purple," and "red," and it felt "hard" and "squishy."[9]

The [petitioner] later apologized to B.R. He told her that he would buy her anything she wanted because he made her touch his penis. B.R. told him that she wanted a teddy bear, but she testified that she "was just kidding." The [petitioner] gave B.R. a teddy bear, and B.R. told her mother that he gave it to her for helping coach other students.

In May 2002, the [petitioner] touched B.R.'s breasts. She remembered that it was May because her mother noticed that she was starting to develop breasts on May 1. Her mother told her to remember this important date and to tell the [petitioner] about her development. When B.R. told the [petitioner], he asked to see and touch her breasts. While in the [petitioner]'s office with the door closed, B.R. pulled her leotard aside, and the [petitioner] touched her breasts. B.R. explained that her back was to the door and that the [petitioner] was facing her.

In June 2002, B.R. began complaining of back pain. In the evenings, B.R.'s mother would place ice on B.R.'s back and give her Advil. B.R. continued to practice gymnastics during the following weeks although her back pain did not subside. B.R.'s mother testified that B.R. had "a couple of especially hard workouts," and she testified to one in particular. On July 1 or 2, the [petitioner] telephoned B.R.'s mother and told her that B.R. needed to quit gymnastics because B.R. would not follow his instructions. She spoke with B.R. that evening, and B.R. told her that the [petitioner] became angry when she refused to do back handsprings on the high beam because her back hurt. The [petitioner] became enraged and left the gymnasium for approximately one and one-half hours. A 17-year-old gymnast supervised the students in his absence. B.R. informed her mother that she did not enjoy gymnastics and that she wanted to quit. B.R. testified that the touching was the real reason she wanted to quit.

B.R.'s mother admitted that she enjoyed watching her daughter practice gymnastics and compete, but she testified that she supported B.R.'s decision to quit. Therefore, she called the [petitioner] the next day and told him that B.R. would not be attending practice and wanted to quit gymnastics. That evening, the [petitioner] and Mia Yabut, B.R.'s friend and practice partner,

---

[9] The record is unclear whether the office door was closed during these offenses.

-6-

drove to B.R.'s home in the tumble bus.[10] B.R. joined them in the tumble bus, and B.R. told the [petitioner] she wanted to quit because she no longer enjoyed practicing gymnastics. B.R. testified that the [petitioner] made Miss Yabut leave the bus and then asked if she wanted to quit because he was touching her. She confirmed that the true reason for quitting was the touching. The [petitioner] told B.R. that he would not touch her again. At some point, the [petitioner] and B.R. went inside the house. B.R., her mother, and the [petitioner] went to B.R.'s bedroom. The [petitioner] begged B.R. not to quit gymnastics, and he cried. No decision was reached at that time.

Later in July, the [petitioner], B.R., and her parents met at the gymnasium again to discuss whether she would quit. B.R.'s mother testified that she wanted B.R. "to quit for the right reason." She did not want B.R. to quit because she was scared to do a trick or had a bad practice. B.R.'s mother testified that at the meeting, B.R. was "defiant, like [she] had never seen her before." B.R. testified that her mother encouraged her to try again. Her mother left the office because she was frustrated regarding B.R.'s defiant behavior and wanted her daughter to quit for, what she considered, an "appropriate reason." At this meeting, they failed to decide whether B.R. would continue practicing gymnastics.

While the [petitioner], B.R., and her parents continued to discuss B.R.'s involvement with gymnastics, a doctor examined B.R.'s back. The doctor determined that B.R. had fractured the L-5 vertebrae, and he prescribed that she wear a back brace for at least three months. The doctor later extended the time to four months. While B.R. wore the brace, she did not practice gymnastics. Instead, she worked sporadically at the gymnasium concession stand.

On September 7 or 8, 2002, the [petitioner] went to B.R.'s house for dinner. After dinner, the [petitioner], B.R., and her two sisters searched for the family dog. During the search, B.R.'s oldest sister told the [petitioner] that B.R. thought a certain young boy was cute. The [petitioner] teased B.R., and she struck him in the head. B.R. explained at trial that she hit him because of the teasing and her pent-up anger from the touching.

---

[10] According to the [petitioner]'s testimony, a tumble bus is a school bus with removed seats and miniature gymnastics equipment.

After finding the dog and returning to the house, the [petitioner] told B.R.'s mother that he was "extremely angry" with B.R., that she had hit him, and that he was going to leave "before he lost his cool." B.R.'s mother testified that she asked B.R. why she struck the [petitioner] and why the [petitioner] grew angry at B.R. "over seemingly insignificant things." B.R. told her mother that she had many reasons for hitting the [petitioner]. Finally, B.R.'s mother asked, "[I]s he touching you inappropriately?" B.R. answered that he had touched her inappropriately. At trial, B.R. testified, over objection, that after she told her mother, her mother commented that "she kind of felt like something like that was going on."

B.R.'s mother testified that she hugged B.R. and told her that it would never happen again. When she asked, B.R. where the [petitioner] touched her, B.R. replied, "[h]er private spot." B.R. testified that she finally told her mother "[b]ecause [she] couldn't bear having it inside [her]." She stated that on several occasions, the [petitioner] would tell her not to tell anyone because he "would get in trouble." B.R. believed she would "get in trouble for telling because [she] thought he would get angry at [her]."

The next morning B.R.'s parents contacted the police. B.R. and her parents met with Detective Breedlove at the Brentwood Police Department on September 10, 2002. Detective Breedlove conducted B.R.'s interview in a conference room equipped with video and audio recording devices, which he used to record the interview.[11] B.R.'s parents observed the interview on a closed circuit television. B.R.'s mother testified, over objection, that "[she] knew that [B.R.] was being totally honest. [B.R.] was telling [Detective Breedlove] exactly what happened." She further testified that B.R. acted "somber," but at times, she acted "silly, . . . not like herself at all."

Detective Breedlove described B.R.'s demeanor as sometimes being "happy" and "friendly," but she then acted "stoic" and "flat." B.R. looked down and softened her voice when she described "sensitive subjects," and she "shudder[ed]" while describing certain incidents.

Detective Breedlove attended a second interview with B.R. Over objection, he testified that B.R.'s statements during the interviews and at trial regarding where the [petitioner] touched her, when he touched her, and where she was while the [petitioner] touched her were consistent. He explained that

---

[11] The videotape was shown to the jury during Detective Breedlove's direct examination testimony.

B.R. did not remember dates or the specific number of times the [petitioner] touched her vagina, but she never wavered from her story.

Detective Breedlove testified on cross-examination that although B.R. varied the number of times that the [petitioner] touched her vagina, he believed her testimony was consistent for a child. Detective Breedlove admitted that B.R. made a mistake when she told him that the [petitioner] was wearing shorts when he exposed his penis. Detective Breedlove stated that after that mistake, B.R. consistently stated that the [petitioner] was wearing black pants. He agreed, however, that B.R.'s testimony was "fairly inconsistent" regarding whether the [petitioner] held the video camera or whether it was on the ground while he filmed B.R.'s vagina in the straddle-stretch position.

Subsequent to the September 10, 2002 interview, Detective Breedlove obtained search warrants for Esprit Gymnastics and the [petitioner]'s residence. On the evening of September 11 and prior to executing the warrants, Detective Breedlove visited B.R.'s home. With her parents' permission, B.R. agreed to place a "perp phone call" to the [petitioner]. Detective Breedlove testified that the purpose of the telephone call was to gather information and possibly an admission from the [petitioner]. In the presence of her parents and Detective Breedlove, B.R. telephoned the [petitioner] at the gymnasium, and Detective Breedlove recorded the conversation.

During Detective Breedlove's testimony, the [s]tate played the recorded conversation for the jury and entered a transcript of the conversation into evidence. During this conversation, B.R. told the [petitioner] that she was worried about him touching her "private spots." The [petitioner] responded, "No, I'm not going to do that." B.R. also told the [petitioner] that she was worried about the videotapes. The [petitioner] stated, "There [are] no video tapes." The two then argued over whether there are tapes of her "private spot." Then, the [petitioner] stated, "I have no idea what you're talking about . . . ." B.R. replied, "You, just promise me you destroyed them, okay?" The [petitioner] stated, "Whatever." After this response, they changed the subject, and at one point, the [petitioner] spoke with B.R.'s mother. He failed to mention B.R.'s allegations. Eventually, the [petitioner] spoke with B.R. again, and the telephone conversation ended without further discussion of the offenses.

After recording the telephone conversation, Detective Breedlove and other Brentwood Police Department personnel executed the search warrant first on Esprit Gymnastics and then on the [petitioner]'s residence. Initially, the [petitioner] gave his consent to search the gymnasium, but he later revoked consent. Detective Breedlove produced the warrant, and the police searched the gymnasium. After this search, the [petitioner] followed the police to his residence, and it was searched.

The police seized approximately 79 videotapes from the gymnasium and the [petitioner]'s residence. Detective Breedlove and two members of Project Alert[][12] viewed all 79 tapes. None of the 79 videotapes contained footage of B.R.'s uncovered vagina made while she performed the straddle stretch. Of the 79 videotapes, 25 were digital VHS tapes. Detective Breedlove testified that the 25 digital tapes contained practice routines of the [petitioner]'s students. Five of the 25 digital tapes, labeled A through E, focused on B.R.; the [petitioner] focused the camera on "all three ... of the victim's private areas." Detective Breedlove stated that the [petitioner] "zoomed" the camera in on B.R.'s clothed vaginal area more than 200 times. He explained that some shots occurred when B.R. did a gymnastic skill, but many times, the [petitioner] "zoomed" in on B.R.'s vaginal area when she was not doing anything of a "gymnastics nature."

In tape A, the [petitioner] "zoomed" the camera in on B.R.'s vaginal area 81 times. In tape B, he focused on her vaginal area 84 times. In one of the 84 shots, B.R. was pushing a mat underneath another student doing a skill on the trampoline. At this point, her legs obstructed a view of her vaginal area. Detective Breedlove testified that as the [petitioner] "zoomed" in on B.R., he stated her name and that she "better get that in, you're totally blowing it now." She placed the mat a couple more times, and the [petitioner] stated her name again and said "hang on to the mat and get it in like you used to, please." B.R. changed positions making her vaginal area visible, and the [petitioner] said, "better, thank you" and then stated the victim's name. Detective Breedlove testified that during another shot of B.R. on tape B, while she was lying down, the [petitioner] was distracted by someone. He told the person to "give [him] a second" as he "zoomed" the camera in on B.R.'s vaginal area. Detective Breedlove testified that the [petitioner] focused on B.R.'s vaginal area 69 times in tape C, five times in tape D, and three times in tape E.

---

[12] Project Alert is a section of the National Center for Missing and Exploited Children. The members are mainly retired law enforcement officers. This organization assists police departments with investigations.

At trial, Lucy Fox, a judge and member of USA Gymnastics, the country's gymnastics governing body, reviewed several portions of videotape A. Referring to the "handstand straddle down" position, she stated that there is no gymnastic purpose for "zooming in" on the gymnast's vaginal area. She asserted that there was no gymnastic purpose for focusing on the gymnast's vaginal area when she pushed the mat under another gymnast who was flipping on the trampoline. Ms. Fox continually asserted the lack of any gymnastic purpose for each of the scenes she viewed.

Regarding spotting and stretching techniques, Ms. Fox explained that professional members of USA Gymnastics must pass a safety certification test based upon the USA Gymnastics Safety Handbook. The Handbook lists regulations for equipment and spotting techniques. Ms. Fox read the Handbook's "Hand Spotting" section into the record.

> Hand spotting refers to a method of spotting where a coach places his or her hands on the gymnast, and lifts and manipulates and/or supports the gymnast in mastering a skill. Warning and consent documents should refer to the act of hand spotting and what it means. All spotting should result in minimal touching support, and athletes should be informed about the potential for touching while being spotted. Unnecessary touching should not be used particularly when the spotter is male and the gymnast is female. Gymnast and parents should be aware that from time to time a slip may occur and the gymnast will be touched on the buttocks, crotch or chest. The coach and gymnast should understand such touching is at a minimum and should not occur repeatedly.

> If the coach or instructor accidentally touches one of these areas, he/she should be sensitive to the situation and indicate that the touch was an accident by a brief apology and then return to instructions. When a coach/instructor is performing a rescue type spot, then concern about touching a private area is obviously trivial in comparison to the consequence of the unprotected fall.

Ms. Fox also explained that the private parts, the crotch, buttocks, and chest, are "no zones." She stated that there is no reason to touch the no zones,

except possibly for a rescue spot. Rescue spotting is when the coach will "grab" the gymnast to protect him or her from injury. The coach prevents the gymnast from hitting his or her head, or the coach stops the gymnast's rotation.

Ms. Fox further explained how a gymnast performs a frog stretch, and she demonstrated the proper placement of the coach's hands while hand spotting in the stretch. She stated that "[n]o coach should place [his or her] fingers . . . between an athlete's legs." She testified that frog stretching is not related to rescue spotting.

Ms. Fox also testified that a coach should not place his or her fingers between a gymnast's legs while the gymnast performs the straddle stretch. She stated that the coach's fingers should be placed "towards [the gymnast's] legs diagonally or . . . straight up towards [the gymnast's] head along [his or her] back." The hands should never rest on the inner thigh area.

On cross-examination, Ms. Fox explained that when a gymnast performs the frog stretch, a coach should place his or her hand "midway down [the gymnast's] tush," but "not cupping [the gymnast's] tushes." She stated that this is an exception to the "no zone" rule, but a coach should never touch the vaginal area of a student. Ms. Fox explained that TOPS testing, testing for gymnasts training for the elite track, examines gymnasts' strength and flexibility. During this testing, coaches take several measurements, one being from the gymnast's hip bone to the floor while in a split. She admitted that the coach touches the vaginal area, the hip bones, but the coach does not touch the vagina or the inner thigh. Ms. Fox testified that pictures of the cat leap position would show the crotch area, but it would also show the legs and feet for positional purposes. Finally, she stated that neither a student nor a coach would benefit gymnastically from watching videotapes that only show a gymnast's crotch.

On October 2, 2002, personnel at Our Kids Center evaluated B.R. Phyllis Thompson, a licensed social worker, testified at trial. She obtained B.R.'s medical history and explained the process of the medical examination. Ms. Thompson stated that this initial interview dictates the invasiveness of the physical examination.

Ms. Thompson testified that B.R. told her that she was having nightmares about the [petitioner]. When Ms. Thompson asked her what the [petitioner] did to her, B.R. replied that he touched her "private spot" many

-12-

times. B.R. further stated that the [petitioner] touched "the part she pees from-with his finger." B.R. was unsure whether he touched the inside or outside of her vagina. Ms. Thompson testified that B.R. stated that she felt pain when the [petitioner] touched her "private spot," but B.R. did not bleed during or after the contact.

B.R. told Ms. Thompson that the [petitioner] touched her breasts and made her touch his penis. She demonstrated the motion that she made during the contact and stated that nothing came out of the [petitioner]'s penis. Ms. Thompson testified that she failed to ask B.R. if she saw the [petitioner]'s penis.

After the grand jury indicted the [petitioner], Detective Breedlove, accompanied by other officers, arrested him at Esprit Gymnastics.

At trial, the [petitioner] called seven witnesses, including the victim, and he testified on his own behalf. Three witnesses, Edmund Yabut, M.D., Dee Ann Melton, and Michelle Day, whose children practiced under the [petitioner], testified concerning the [petitioner]'s good character. They also described his coaching style as "aggressive," "intense," or "devoted" and explained that the [petitioner] did not have a policy that limited parents' access to the gymnasium floor or the [petitioner]'s office. Defense witness, Rob Tallman, who also was a parent of a student, testified concerning the opening in the [petitioner]'s office wall. In addition, the [petitioner] called Brentwood Police Department Corporal Melissa Westbrook, who conducted the initial interview of the victim. Mia Yabut, Edmund Yabut's daughter and B.R.'s practice partner, testified on the [petitioner]'s behalf.

The [petitioner] testified that he moved to Tennessee from California after accepting a job as the director of the girls' team program at Let It Shine Gymnastics. While coaching at Let It Shine, he moved B.R. into his training group, and soon after the regrouping, he met B.R.'s family.

After coaching six months at Let It Shine Gymnastics, the [petitioner] was fired, according to him, because he and the owner disagreed over the running of the girls' team program. Instead of returning to California, the [petitioner] opened his own gymnasium, Esprit Gymnastics, at the request and with the help of three families, the Yabuts, Yepezs, and Meltons. B.R.'s family joined the efforts by contributing money. On December 8, 2000, B.R. and the other "six pack" members, Mia Yabut, Lilly and Andy Yapez, Jordan

-13-

Melton, and Catherine Traxler began training at Esprit Gymnastics under the [petitioner]'s tutelage.

The [petitioner] described B.R. and his relationship with her. He testified that B.R. had "ability in gymnastics." In addition, he stated that she was fearful, and this fear hindered her gymnastic development. The [petitioner] said that B.R. was not "tough" and that none of the girls were, and as a coach, he had to "maximize [the girls'] strengths; . . . minimize their weaknesses." Thus, he described his coaching style as "aggressive." The [petitioner] admitted that he developed more of a friendship with B.R. than the other girls because he "was over at [her] house more." He stated that this friendship interfered with his coaching and may have caused other students to quit practicing at his gymnasium.

Four defense witnesses, Dr. Yabut, Miss Yabut, Ms. Melton, and Ms. Day, described the [petitioner]'s and B.R.'s relationship. Doctor Yabut testified that B.R. "grabbed [the petitioner's] attention all of the time." He stated that the relationship did not concern him until his daughter complained of a lack of attention from the [petitioner]. Doctor Yabut also testified that he thought the female students had "crush[es]" on the [petitioner] and that his daughter was jealous of B.R. Miss Yabut confirmed her father's opinion and admitted that she was "a little jealous of [B.R.'s] attention." She testified that the [petitioner] would talk to B.R. more than he would the other students. Another defense witness at trial, Ms. Day, described the relationship, and she testified that she thought B.R. "had a little bit of a crush on [the petitioner]." She testified that B.R. would walk up to the [petitioner] and put her arms around his shoulders, or she would sit down with him and engage in conversation. Ms. Day testified that the [petitioner] would ignore B.R., undrape her arm, and direct her to go perform a skill. Ms. Melton testified that B.R. "had a crush on [the petitioner]." She testified that B.R. adored the [petitioner], and "[i]t was obnoxious" and "a huge annoyance."

The [petitioner] testified to the size and layout of the gymnasium and office area. He stated that from the parent viewing area, all areas of the gymnasium were visible except the bathrooms and a portion of the rod floor where the hot water heater sits. He also explained that the office door would not close or lock, and he described the opening in the office wall, testifying that the opening was "90 inches tall or so, 65 inches wide." The [petitioner] stated that he was never in his office alone with the door closed with B.R. or with any other student. Rob Tallman testified that in late August or early

-14-

September the [petitioner] closed the opening and asked him to finish the drywall.

The [petitioner] denied touching B.R.'s vagina while she performed the frog stretch. He explained that the purpose of the stretch is to gain strength and flexibility, mainly for balance beam skills. He elucidated that frog stretches affect "hip turnout" and pelvic tilt. When students perform the frog stretch, coaches forcefully push downward on the buttocks to increase the stretch. The [petitioner] stated that during the stretch, the student's hips rotate and the private area is underneath him or her "flat on the ground." He explained that "there is really nowhere for [a coach's fingers] to go." Thus, he asserted that he never knowingly or accidentally touched B.R.'s vagina during the frog stretch.

Ms. Melton, Ms. Day, and Miss Yabut testified regarding stretching. Ms. Melton testified that a mat was "not necessarily" in the vicinity of the stretching. Both Ms. Melton and Ms. Day testified that neither one became alarmed when watching the [petitioner] stretch B.R. Miss Yabut testified that she and other students practiced on the trampoline while the [petitioner] stretched B.R. on the rod floor. She testified that she would watch the [petitioner] stretch B.R. because she was jealous of the attention the [petitioner] showed B.R. Miss Yabut also stated that she never saw the [petitioner] inappropriately touch B.R. during the stretches.

The defense called B.R. to clarify where she was located on the rod floor when the [petitioner] touched and filmed her vagina as she performed the straddle stretch. B.R. used a diagram she had drawn in a previous interview and identified the front of the gymnasium on the diagram. According to the diagram, her feet pointed toward the right wall.

On cross-examination, the [s]tate asked further questions regarding her location, and B.R. testified that she drew the diagram "from . . . if you look down." She further testified that her back was to the wall with mirrors. We discern from the record that the mirrored wall is the left wall of the gymnasium.

The [petitioner] explained that B.R. had a fear of doing certain skills on the beam, namely the back walk over and the back handspring. On July 1, 2002, B.R. was scared to perform the back handspring, so the [petitioner] explained that as part of his coaching strategy, he left the gymnasium. He

-15-

stated that if he "remove[d himself] from the environment," then B.R. would want to perform the skill. He left a 17-year-old coach in charge of the students while he shopped at Home Depot. At this point, he telephoned B.R.'s mother and reported the incident. Upon returning to the gymnasium, he learned that B.R. had performed the skill, and at his request, she demonstrated it twice more.

Although Ms. Melton did not witness this incident, she testified to its occurrence.[13] She then testified that "B.R. was crushed because [the petitioner] basically chose gymnastics over what she thought their relationship was." She explained that from that day forward, B.R. did not look at or speak to the [petitioner]. She testified that B.R. made excuses for why she could no longer participate in gymnastics, and Ms. Melton testified that B.R.'s back injury, in her opinion, was not legitimate.

The [petitioner] testified that B.R.'s mother telephoned him on July 2, 2002, and informed him that B.R. would not be attending practice. On July 3, the [petitioner] and Mia Yabut arrived at B.R.'s home in the tumble bus. The [petitioner] stated that Miss Yabut and B.R. played in the tumble bus while he showed B.R.'s mother the tumble bus's new generator, which B.R.'s mother had purchased. After B.R.'s mother returned inside the home, the [petitioner], Miss Yabut, and B.R. remained on the bus until Miss Yabut announced that she was going inside. Miss Yabut testified at trial that she left the bus "[b]ecause [she] thought they wanted to talk alone for a while." The [petitioner] and B.R. then talked about her quitting gymnastics. The [petitioner] testified that he encouraged her to keep participating. He stated that the conversation "centered around" "another skill on bars that she was particularly fearful of." He testified that B.R. never told him that she wanted to quit because he was sexually abusing her.

After Miss Yabut returned to the bus, the three went inside B.R.'s house. In B.R.'s bedroom, the [petitioner], B.R., and her mother discussed her future in gymnastics. The [petitioner] stated that he, B.R.'s mother, and B.R. all cried during the conversation, and he did not testify whether B.R. made a

_____

[13] Ms. Melton testified to the incident on direct examination. On cross-examination, the State elicited that she had not personally witnessed the event. The State moved to strike her prior testimony. While the trial court and trial counsel discussed the motion, Ms. Melton interrupted them four times, and the court had to instruct her to stop testifying. The trial court then denied the State's motion.

-16-

decision to quit that night. The [petitioner], B.R., and her parents continued to discuss her gymnastics future throughout July, August, and September.

Defense witness Corporal Westbrook's testimony regarded her September 9, 2002 interview with B.R. Corporal Westbrook was the first Brentwood Police Department employee to interview B.R. after her parents contacted the police. Corporal Westbrook explained that she was the initial responding officer, and she did not question B.R. "per se." Eight days after the interview and at the request of Detective Breedlove, Corporal Westbrook wrote a supplemental report of this interview. She testified that B.R. told her that the [petitioner] touched her breasts and vagina. She further testified that her report stated that "[B.R.] advised that [the petitioner] had touched her breasts several times, too."

On cross-examination, Corporal Westbrook testified that the interview's purpose was to determine whether to investigate the allegations further. She stated that she wrote the report from cursory notes, and B.R.'s description of the breast touching "was just more fleeting than anything."

The defense called B.R. to testify regarding this issue, and B.R. stated that she told Corporal Westbrook that the [petitioner] touched her breast "once for sure." She further testified, "I think I said several for him touching my vagina. I never said - I don't think I said several for him touching my breasts."

Two days after the September 9, 2002 interview, B.R. telephoned the [petitioner] at the gymnasium. The [petitioner] stated that he was teaching class at the time of the telephone call. He explained that during the conversation, he was preoccupied with his students. When B.R. told him that she was worried about him "[t]ouching [her] in [her] private spots," the [petitioner] replied, "No, I'm not going to do that." He further testified that he "had never done that." The [petitioner] explained that he was "shocked" by the comment and uncertain how to react. At trial, he denied filming and touching B.R.'s vagina, and he stated that he ended the telephone conversation with "[w]hatever" because he refused to continue this conversation over the telephone. The [petitioner] then spoke with B.R.'s mother. He explained at trial that he failed to discuss B.R.'s allegations with her mother because it was inappropriate to do so over the telephone.

On cross-examination, the [s]tate played the audiotape of the telephone call for the jury. The [petitioner] agreed that on direct examination he testified

-17-

that he "was shocked and caught off guard" by B.R.'s allegations during the telephone call. After hearing the audiotape, the [petitioner] testified that "[s]hock and caught off guard may not be distinguishable in [a person's] voice."

Shortly after B.R. placed the September 11, 2002 telephone call, the police entered the gymnasium and spoke with the [petitioner] in his office. After another coach finished the students' workouts and they left, the police searched the gymnasium. Afterwards, the [petitioner] followed the police officers to his apartment where they continued searching. Because of the searches, the [petitioner] explained that he never had the opportunity to discuss the allegations with B.R. and her mother. He agreed that the police seized several videotapes filmed by him.

At trial on cross-examination, Ms. Melton viewed, we surmise from the record, videotape A. She agreed that the videotape showed her daughter's crotch area while she was not performing a gymnastic skill, and Ms. Melton testified that the [petitioner] "is really interested in anatomy." She testified that the [petitioner]'s purpose was to analyze "hip placement." Ms. Melton further testified that during the investigation, Detective Breedlove showed her a videotape with a close-up shot of her daughter's crotch,[14] and "maybe [she] did" tell Detective Breedlove that portions of the videotape were inappropriate. However, she testified that the videotape she viewed at trial did not "bother [her] whatsoever."

She viewed another scene on videotape A that showed a close-up of B.R.'s vaginal area and buttocks while she pushed a mat under another student performing a trick on the trampoline. Ms. Melton testified that the [petitioner] would not film his students other than for gymnastics purposes. In response to Ms. Melton's answer, the [s]tate showed Ms. Melton two other scenes on the videotape outside of the jury's presence. Once the jury returned, Ms. Melton described what she saw. She testified that the scene showed the gymnasium's bathroom, and it showed that the [petitioner] walked to the toilet, pulled down his shorts, sat on the toilet, and then wiped himself from the front. In the next scene, Ms. Melton agreed that the video camera was wrapped in a black material, and there was a hole in the material for the lens. She stated that "someone" came into the camera's view. When the [s]tate asked her if she

---

[14] The record is unclear whether the videotape she viewed with Detective Breedlove was videotape A.

-18-

noticed that the person's clothing changed to a "nude shade," she replied, "I'm not putting it together. I'm really not." She admitted that the person sat down on the toilet as the [petitioner] did in the previous scene, but she stated that she was not sure whether the person reached for toilet paper. After testifying to the contents of these scenes, she still contended that the [petitioner] "wouldn't tape the girls for any other purpose other than gymnastics."

At trial, the [petitioner] also reviewed portions of the videotapes. First, the [petitioner] explained that the shots were of B.R.'s "pelvic area," not vaginal area. He commented that the focusing on B.R.'s pelvic area while she pushed a mat under another gymnast served gymnastic purposes, including the study of biomechanics, teaching tools for students, and teaching tools for coaches. He disagreed with Ms. Fox's testimony that the videotapes serve no gymnastic purpose and explained that he is a "minority in the coaching community" because of his "cutting edge" techniques. The [petitioner] stated that the purpose of the close-up, pelvic shots of B.R. while she stood at the wall was to teach her the "Staulder press." He further explained that B.R. cannot perform a "Salto up," so he instructed her to perform "Salto downs." By focusing the camera on her pelvic area when she performs certain skills, he could analyze whether B.R.'s body position was biomechanically correct, namely her pelvic tilt.

At the end of his direct examination testimony, the [petitioner] denied touching and filming B.R.'s vagina for sexual gratification purposes. He further denied touching her breasts for sexual gratification.

Regarding the bathroom scenes in videotape A, the [petitioner] testified on cross-examination that he filmed the first scene on July 21, 2001, at 10:43 p.m. He admitted that the camera sat on a "drawer thing" in the bathroom of the gymnasium. He agreed that he paced in the camera's view, and then he walked to the toilet, pulled down his shorts, sat on the toilet, and then wiped himself from the front. The [petitioner] further agreed that he filmed the second bathroom scene a few hours later at 4:26 a.m. He admitted that he surrounded the camera with black trash bags, the roll of extra trash bags being visible in the scene, and there was a hole for the lens. The [petitioner] did not admit that he took his clothes off when the [s]tate asked him if he became "totally skin colored," but he agreed that he sat on the toilet and wiped himself from the front. After this portion of testimony, the [s]tate showed the videotape to the jury. The [petitioner] contended that he did not attempt to

covertly videotape students in the bathroom; he testified that he videotaped himself.

In rebuttal, the [s]tate called Andy Yepez, a former member of the "six pack," and she testified that the [petitioner] stretched B.R. differently from the other students. The [petitioner] placed his hands on B.R.'s buttocks instead of "on the side" of the back, as he did with every other student. Miss Yepez testified that when he stretched B.R., her view was frequently obstructed by a mat, and parents usually were not present. She admitted that the [petitioner] stretched all students behind the mat and on the same place on the rod floor, but he stretched B.R. longer than he did the other students. The [petitioner] stretched her for 30 seconds to one minute, but he stretched B.R. for approximately 10 minutes.

The [s]tate also called Nancy Westman, mother of one of [petitioner]'s former students. Ms. Westman described the [petitioner]'s and B.R.'s relationship. She testified that the [petitioner] "favored" B.R.; "[h]e spent more time with her, and he hugged [B.R.] more than the other students." Ms. Westman [s]tated that "[t]hey gave each other back rubs," and the [petitioner] did not do this with other students. She testified to one occasion when the [petitioner] and B.R. were tickling each other. Ms. Westman described the interaction as "a boyfriend/girlfriend type relationship, like 16 year olds would act when [they're] dating."

Ms. Westman also described an interaction between B.R. and the [petitioner] while they, along with other gymnasts and their family members, were on a 15-passenger van in San Diego, California. Ms. Westman testified that she and Ms. Melton sat behind B.R.'s mother and in front of B.R. and the [petitioner]. She heard B.R. "kind of squirming," and B.R. said, "[N]o, [the petitioner's name], no, just on my face." Ms. Westman turned around and observed the [petitioner] tickling B.R.'s face. He then rubbed down her arm, eventually onto her leg and thigh. Ms. Westman testified that she heard B.R. [s]tate to just touch her face several times. She [s]tated that she "felt uncomfortable," so she "nudged" Ms. Melton, who looked at them and then, according to Ms. Westman, shook and put her head down. When Ms. Westman heard B.R. say it again, she "turned around completely in [her] seat." She testified that she looked at him and "gave him a look, like what are you doing." Ms. Westman testified that she did not mention the incident to him on the van because she did not want "to get into a big scene."

-20-

In surrebuttal, the [petitioner] called Ms. Melton, and she testified regarding the San Diego incident. Ms. Melton testified that the [petitioner] touched B.R.'s face and arms in a "playful" manner; she described the interaction between the two as "child's play." She [s]tated that B.R. would tell the [petitioner] to stop and that B.R. "was being silly." Ms. Melton testified that there was nothing "sexual" about the actions.

*Schiefelbein*, 230 S.W.3d at 97-111.

The trial court sentenced the defendant to twelve years for each count, to be served consecutively, for an effective sentence of ninety-six years in the Tennessee Department of Correction. *Id.* at 96. Upon appeal, this court affirmed the petitioner's convictions but modified his sentence to thirty-six years. *Id.* at 147. This court further ruled that double jeopardy barred the state from prosecuting the petitioner on the child rape charges. *Id.* at 127. The petitioner successfully petitioned this court for a rehearing of the sentencing portion of his appeal. Upon rehearing, this court reduced the petitioner's sentence to thirty-two years.

In March 2008, the petitioner filed a petition for post-conviction relief, alleging that he received ineffective assistance of counsel during his trial. The post-conviction court found that the claim was colorable and set the matter for an evidentiary hearing. The petitioner presented the following testimony at a two-day evidentiary hearing in September 2008.

David Lewis Raybin testified that he was an attorney with thirty-four years of experience in Tennessee criminal law. He authored *Tennessee Criminal Practice and Procedure* (West 1984) and had previously testified as an expert on criminal defense representation. Mr. Raybin testified that he prepared the petitioner's motion for new trial and represented the petitioner at the hearing on the motion for new trial and on appeal. Over the state's objection, the petitioner tendered Mr. Raybin as an expert on the standard of care for defense attorneys in Tennessee.

Mr. Raybin, in the course of his representation of the petitioner, discussed the trial with trial counsel. Because the state argued that trial counsel had waived issues Mr. Raybin felt were central to the petitioner's case, he wanted trial counsel to testify at the hearing on the motion for new trial about the allegedly waived issues; however, the trial court would not allow trial counsel's testimony. Mr. Raybin testified that the waivers prevented him from securing a new trial for the petitioner, even though he was successful on other issues presented on appeal.

Mr. Raybin opined that trial counsel's performance fell below the standard of care on several occasions. First, he said that trial counsel did not lay a proper foundation for Dr. Yabut to testify that B.R. would have had physical manifestations of the pain that she told Ms. Thompson she experienced, nor did he attempt to have B.R.'s medical record admitted as evidence. The defense theory was that, because she did not have any physical manifestations, B.R. was not truthful when she told Ms. Thompson that the petitioner had touched her; *ergo*, the petitioner was innocent. The state successfully objected as to the relevance of Dr. Yabut's medical testimony because the rape charges, which required proof of penetration, had been severed. Mr. Raybin said that if trial counsel had laid a proper foundation for Dr. Yabut's testimony and the medical record, then the state's relevance objection would have been meritless, and the jury would have heard evidence that B.R.'s statements were medically inconsistent. Mr. Raybin testified that he argued on appeal that Dr. Yabut's medical testimony should have been presented to the jury as substantive evidence of the petitioner's innocence, but he lost the argument because trial counsel had waived the issue by never articulating that Dr. Yabut's testimony was substantive evidence rather than merely for impeachment purposes.

Mr. Raybin testified that trial counsel knew of an audiotape recording of a conversation between B.R. and the petitioner because trial counsel received a transcript of the conversation during discovery. However, Mr. Raybin stated that trial counsel did not request a copy of the tape before trial. Mr. Raybin said that the first time either trial counsel or the petitioner heard the recording was when the state introduced it during Detective Breedlove's testimony on July 8. Mr. Raybin explained that the state thoroughly cross-examined the petitioner on July 11 about his inflection during the conversation. The petitioner was effectively impeached because, according to Mr. Raybin, trial counsel had not prepared him for cross-examination about the recording. The petitioner played the video of his cross-examination for the court, and Mr. Raybin opined that if the petitioner had been adequately prepared, then the state might not have impeached him. Mr. Raybin testified that trial counsel's failure to obtain a copy of the audiotaped conversation, to discuss the recording with the petitioner, and to prepare the petitioner for the state's cross-examination caused his representation to be below the standard of care. He further testified that there was no tactical reason for not obtaining a copy of the audiotape before trial. When asked whether there could be a tactical reason for not objecting to admission of the audiotape, Mr. Raybin opined that one might ask for exclusion of the evidence on a discovery violation or ask for a continuance instead. He said that was not done in this case.

Mr. Raybin testified that the state questioned the petitioner about voice stress analysis, which he said was not permissible under the rules. Trial counsel unsuccessfully objected to the relevance of the line of questioning but did not move for a mistrial. When asked whether the questions about voice stress analysis prejudiced the petitioner, Mr. Raybin responded that

voice stress analysis was analogous to lie detector tests, but trial counsel did not base his objection on the state's use of voice stress analysis as a lie detector.

According to Mr. Raybin, trial counsel did not view all of the videotapes that were evidence at trial. Mr. Raybin explained that the petitioner recorded the victim and other gymnasts, fully clothed, at the gym. Trial counsel requested copies of the tapes, but the state refused, arguing that the tapes were pornographic. Trial counsel requested a discovery violation and an interlocutory appeal, and the trial court denied both. Trial counsel then had to drive to Franklin from Nashville to view the tapes rather than have his own copies. Mr. Raybin said that trial counsel viewed approximately one-third of the tapes, and neither he nor the petitioner had seen them all until trial. He testified that there was no tactical reason for not viewing all of the videotapes but conceded that trial counsel objected to the videotapes in every possible way aside from seeking an extraordinary appeal or continuance. Mr. Raybin further testified that on the petitioner's direct appeal, another panel of this court held that, because trial counsel did not seek a continuance, he did not mitigate the harmful effect of the discovery violation.

Mr. Raybin next addressed the "spectator shift" issue. He explained that the court ordered the trial spectators to move when the state played the videotapes of the gymnasts so they would be unable to see the video. Mr. Raybin testified that he argued on appeal that the "spectator shift" signaled to the jury that "it's so horrible what the [petitioner] did that normal people can't even see it, that it rises to the level of child pornography." He also contended that it "emphasized that evidence to the extreme prejudice of the [petitioner]." Mr. Raybin said the shift occurred "at least half a dozen times." He maintained that the videotapes were the state's "only evidence against [the petitioner] that did not consist of the testimony of the child. It was a piece of ostensible physical evidence[;] therefore[,] it was a paramount evidentiary weight against him . . . ." Mr. Raybin testified that a previous panel of this court deemed this argument waived by trial counsel because trial counsel failed to object and actually acquiesced to the court's order.

Mr. Raybin then testified that the state cross-examined the petitioner about the video tapes, asking whether the petitioner had seen all of the tapes. Mr. Raybin said the petitioner responded that he had not seen all of the tapes because the Brentwood Police Department had prevented him from doing so. Mr. Raybin testified that at that point in the petitioner's testimony, the trial court instructed the jury to disregard the petitioner's statements. During the appeal, Mr. Raybin argued that the trial court's actions amounted to a comment on the evidence and were prejudicial to the petitioner because the trial court was in effect telling the jury that the petitioner was lying. Trial counsel did not object and agreed to striking the petitioner's statements. On appeal, a previous panel of this court deemed the issue waived

because trial counsel had not preserved the issue by objecting. Mr. Raybin testified that criminal defense attorneys have an obligation to "clearly establish the record."

Mr. Raybin recalled that the trial court questioned four of the state's witnesses *sua sponte*, and trial counsel did not object to the questioning at any point. He said that the court asked the victim credibility questions. He opined that in general, when credibility is a central issue, questions about credibility signal to the jury that "the judge is either siding with or against a particular witness." However, Mr. Raybin acknowledged that "the law says that a judge has ample authority to [ask questions of witnesses] to clarify questions [by attorneys], to move testimony along, and where there's confusion." Mr. Raybin testified that this court deemed the issue waived because trial counsel did not object to the trial court's questioning of the victim.

Mr. Raybin recounted that the state called Lucy Fox during the trial and tendered her as an expert in the field of gymnastics. He testified that the trial court asked Ms. Fox "whether a gym instructor should obtain parental consent before video taping the participant[.]" Mr. Raybin did not recall whether the question was from the jurors and denied that it was a legitimate follow-up question or clarified previous testimony. Trial counsel did not object to the question. Mr. Raybin raised the issue on appeal, arguing that the question prejudiced the petitioner because he had not gained parental consent for the videos, but this court deemed the issue waived.

Mr. Raybin testified that the trial court asked the victim's mother whether the victim had shared "her story" with her friends. Trial counsel did not object, and subsequently, this court ruled that the issue was waived. Mr. Raybin further testified that the trial court questioned Phyllis Thompson, a clinical social worker, about how many times the victim mentioned pain in her report. Again, trial counsel did not object, and this court deemed the issue waived.

Mr. Raybin recalled that when the state referred to video footage of the victim, the state used the term "vaginal shots . . . dozens" of times. He testified that the video footage never shows the victim's vagina, nor the vagina of any other female. Mr. Raybin said trial counsel never objected to the use of the term; trial counsel could have asked the trial court to order the state to use "some other non-prejudicial description[,]" but he did not do so.

Mr. Raybin admitted that this court deemed several of the issues he raised on appeal waived because he did not provide adequate citation to authority in his brief. He said "that was not a tactical decision on [his] part[;] it was oversight." Mr. Raybin testified that it is possible for individual errors by trial counsel to be insufficient to merit a new trial, but the cumulative effect of the errors might coalesce to the point that a new trial is warranted. He

also said that the issues brought up in the post-conviction hearing should not be considered previously determined because the issues were deemed waived and not fully heard on the appellate level.

On cross-examination, Mr. Raybin testified that while the medical report was not introduced by either party at trial, Ms. Thompson, the social worker, repeatedly referred to the report in her testimony. He agreed that trial counsel's strategy was to avoid calling Dr. Yabut unless a witness testified that the victim experienced pain, and trial counsel decided to call Dr. Yabut to rebut Ms. Thompson's testimony. Mr. Raybin said that the trial judge would not allow Dr. Yabut's testimony. He agreed that trial counsel made a proffer of proof, which this court reviewed along with the medical report. This court determined that Dr. Yabut's testimony was marginally relevant, and the trial court's error in disallowing the testimony was harmless. Mr. Raybin posited that if trial counsel had presented the testimony of the nurse who prepared the medical report, then Dr. Yabut's testimony would have been directly relevant in impeaching the state's expert, the nurse. Mr. Raybin agreed that the nurse stated in the medical report that the victim's examination "neither confirmed [n]or ruled out the possibility of any type of sexual contact." He further agreed that the trial court ruled that Dr. Yabut's testimony regarding pain was not relevant to the elements of aggravated sexual battery but allowed Dr. Yabut to testify about other things.

Mr. Raybin testified that trial counsel and the petitioner went to the Brentwood Police Department several times, but he did not know whether the audiotape of the conversation between the petitioner and the victim was stored at the police department. He agreed that the transcript of the conversation was accurate. Mr. Raybin testified that, at the time of trial, the discovery rules provided for inspection of evidence and allowed the defense to request a copy. He said that if the defense requested a copy, then the state was required to provide the copy. Mr. Raybin agreed that inspection can sometimes be sufficient. He testified that the petitioner had access to the transcript of the conversation and that he had discussed the conversation with trial counsel.

When asked about making objections as a general matter, Mr. Raybin testified that an attorney might not make an objection for tactical reasons, for example, so as not to draw attention to something. Whether foregoing an objection is reasonable "depends on the nature of the testimony or evidence that's being introduced." Mr. Raybin said that the standard of care requires an attorney to object if the evidence or testimony sought to be introduced is prejudicial to the client. The objection then preserves the issue for appeal and might result in the testimony or other evidence being excluded.

Mr. Raybin testified that a previous panel of this court reviewed some of the waived issues for plain error. For example, this court did not find plain error in the trial court's

questioning of Ms. Fox, the state's gymnastics expert, because "a clear and unequivocal rule of law [had] not been breached and because the [petitioner's] substantial rights [had] not been adversely affected." Mr. Raybin said that plain error review is "almost insurmountable," and he would have had a lower burden to meet if trial counsel had not waived the issues. He agreed that this court ruled that the judge's questions to Ms. Fox, the victim, and the victim's mother did not amount to comments on the evidence. Mr. Raybin agreed that Ms. Fox's reply to the trial court's question, that parental consent is not necessary if video taping is for legitimate purposes, could be interpreted as supportive of the defense theory that the petitioner had a legitimate purpose for taping the gymnasts.

Trial counsel testified that he had practiced law in Tennessee for twenty-eight years. The petitioner retained him prior to the indictment in this matter but after police had seized videotapes and computers from the petitioner's home and office. Trial counsel filed a motion for discovery of the items seized, and originally, the state agreed to copy the tapes for him. Later, however, the state refused to hand over the tapes, reasoning that the tapes were illegal, and therefore, they did not have to turn them over to the defense. Trial counsel moved the court to compel the state to copy the tapes, but the court denied the motion, instead allowing trial counsel to view the tapes at the Brentwood Police Department. Trial counsel testified that the court's ruling made it difficult for him to review all of the tapes. He reviewed six or seven of the tapes housed at the police department.

Trial counsel testified that he believed the trial court's denial of his motion to compel discovery was unlawful. He filed a Rule 9 application for an interlocutory appeal with the trial court, which the court denied. Trial counsel did not file a Rule 10 extraordinary appeal because he believed this court would not have compelled the state to provide copies because he had access to the tapes. He stated that he would have reviewed the twelve tapes in question if the state had provided copies of them. Trial counsel explained that, of the tapes he did review, he would write down each instance that the tape showed a gymnast's pelvic area. He stated that he did not discuss the tapes with the petitioner while at the police department because they "didn't feel comfortable talking about those tapes there at the police department." By the time of trial, trial counsel had not reviewed the twelve tapes at issue. He acknowledged that he could have asked for a continuance but did not.

Trial counsel agreed that, before the state played the videotapes for the jury, he brought the issue of the revictimization of the child to the court's attention. He did not know whether his statements in that regard prompted the court to order that spectators in the courtroom move so they could not see the videos. Trial counsel did not object to the shift, believing that if the public saw the videotapes, the petitioner's reputation as a gymnastics instructor would be damaged. Trial counsel said that, at that point, he believed that the jury would acquit the petitioner, and his decision not to object was based on his concern for the

petitioner's business rather than his "strategy of guilt or innocence." He stated that the shift would not affect the jury but acknowledged that he did not consider what the jury would think about the shift. Trial counsel denied that he suggested the spectator shift as "an attempt to ingratiate [himself] to the court."

Trial counsel recalled that the petitioner, during his testimony at trial, said that the court had imposed "strict rules" on him that made him unable to view all of the videotapes. Trial counsel said that the petitioner's statement was true because the trial court did place restrictions on their access to the tapes. He said that the appellate court had ruled that the trial court erred in placing those restrictions. Trial counsel recalled that the trial court instructed the jury to disregard the petitioner's testimony "concerning any alleged denial of access to tapes by the Brentwood Police Department prior to today . . . ." Trial counsel did not object to the trial court's instructions. He could not remember whether he agreed with the trial court's instructions and said that if he did, he made a mistake in so agreeing. Trial counsel testified that he did not have a tactical reason for not objecting to the trial court's actions. While he could not recall this court's ruling on the matter, trial counsel stated that a trial attorney has a duty to preserve the record for appeal and failing to object constitutes waiver of an issue.

Trial counsel testified that in his opening statement, he told the jury that credibility would be a central issue in the case. He agreed that attacking the victim's credibility was part of his defense strategy, but he did not object when the trial court asked the victim whether she was telling the truth and whether anyone had coached her. Trial counsel said that he believed it was a proper line of questioning and stated that he would have asked the same questions. He recalled the judge asking another witness, Ms. Fox, whether the petitioner should have obtained parental consent for videotaping the gymnasts, and he stated that he believed her answer, that the petitioner did not need parental consent if the taping was for legitimate gymnastic purposes, was beneficial to the petitioner's case. Trial counsel agreed that he did not object to the trial court's questioning of the victim's mother, saying that he did not believe he had "the authority to tell a judge that he can not [sic] ask questions nor [did] he believe . . . that the judge was commenting on the evidence one way or another." Trial counsel clarified that he had the authority to object if he felt the judge asked an inappropriate question, but he did not believe the judge asked any inappropriate questions in this matter. Trial counsel recalled that the judge asked Ms. Thompson, the social worker, about the victim's references to pain. Trial counsel said that he wanted her to testify about the victim's report of pain because his strategy was to bring out that pain was inconsistent with the medical findings. He planned to have Dr. Yabut testify in that regard, but the trial judge did not allow the doctor's testimony. Trial counsel agreed that he could have called the nurse who examined the victim for the same purpose, but he believed that Dr. Yabut was more qualified. Trial counsel testified that the medical report could have been admitted

through the nurse's testimony, but he maintained that the information in the medical report was more important than the report itself.

Trial counsel could not recall the assistant district attorney general using the phrase "vaginal shots" in reference to up-close video footage of the victim and other gymnasts. He testified that "if you take a video camera shot of the hip pelvic area[,] and the legs are spread apart[,] the vagina area is going to be visible." He never saw an unclothed vagina in the videos, however. Because he did not object to the use of the term "vaginal shots" during trial, trial counsel "guess[ed]" that he thought the term was "proper and fair" at the time. Trial counsel testified that he did not view the phrase as contrary to his defense theory that the videos were taken for legitimate gymnastic purposes.

Regarding the audio taped conversation between the petitioner and the victim, trial counsel said he never received a copy of the tape, despite making a discovery request. He did not include the audiotape in his motion to compel the state to turn over copies of the videotapes because he believed that the state was going to give him a copy of the audiotape without being compelled to do so. Trial counsel testified that he believed he listened to the audiotape prior to trial, in order to compare it to the transcript of the conversation, but he had no recollection of exactly when and where he listened to it. Trial counsel knew that the petitioner had not heard the audiotape prior to trial, and the petitioner was always with him when he went to the Brentwood Police Department to view the videotapes. He said that he might have heard the tape somewhere other than the police department. He did not object to the state's playing the tape during trial.

Trial counsel could not recall the state's cross-examination of the petitioner about the taped conversation. He acknowledged that it would have been proper for him to prepare the petitioner for cross-examination by listening to the tape together, but that did not occur. Trial counsel agreed that the petitioner could not have known what his voice inflection was during the conversation by reading the transcript. He recalled that the state played a portion of the audiotape during the cross-examination, which he did not do in his direct examination. Trial counsel further recalled that the state questioned the petitioner about voice stress analysis and compared it to a lie detector test. He testified that evidence about lie detector tests is inadmissible in criminal trials. He did not object to the questions about voice stress analysis nor did he move for a mistrial.

Trial counsel testified that, on each day of trial, he requested and received a video copy of that day's testimony. Counsel met with the petitioner each day after trial at counsel's home, and he reviewed the videotaped testimony after the petitioner left every night.

On cross-examination, trial counsel explained that his theory for the petitioner's defense was to question the victim's motivation for making the accusations against him. He said that the victim's mother pressured her into gymnastics, and she had tried to quit before. Trial counsel's theory was that the victim used the accusations against the petitioner as a way to quit without her mother being angry. Trial counsel testified that he developed his theory by questioning both the victim and her mother. He played a video of the victim's interview with the police for the jury to support his theory that the victim had been coached. He also cross-examined the victim and her mother about the victim's inconsistent statements. Trial counsel tried to show the jury that the gym and office layout would have meant that people were always within view when the petitioner allegedly touched the victim. He used videotapes to show the layout of the gym, introduced pictures of the office, and brought in the mat that the victim said hid them from view. Trial counsel developed his theory that the petitioner's videotapes were for legitimate gymnastic purposes by cross-examining Ms. Fox with gymnastics magazines and treatises.

Trial counsel filed numerous pretrial motions in this matter. He successfully argued that a video of the petitioner in a bathroom should be excluded from the state's case-in-chief and that a prior conviction was stale, but he was not successful in getting one of the indictment counts dismissed or having the videos of the gymnasts excluded.

Trial counsel testified that he asked the petitioner whether the videos they had not watched were different than those they had watched. The petitioner replied that they were basically the same thing. Trial counsel said that he did not see anything at trial that was different from what he had viewed before trial. He did not believe he would have been successful if he had filed for a continuance to view the remaining videotapes. Trial counsel testified that he would not have stopped watching the videotapes if he had believed there was anything different on the remaining tapes.

Trial counsel explained that he did not want the public to see the videotapes out of context. He was concerned about the possibility because of the media coverage of the trial. He did not consider whether the spectator shift would draw undue emphasis to the videotapes. Trial counsel testified that, in hindsight, he should have objected to the trial court's *sua sponte* impeachment of the petitioner. When the trial court brought up its protective order that limited the petitioner's ability to view the videotapes, trial counsel stated for the record that he was not waiving his objection to the protective order by agreeing to the trial court's striking of the petitioner's testimony.

Trial counsel testified that, early in the proceedings, he came to the conclusion that the petitioner was not receiving a fair trial from the trial judge. The trial judge severed the rape charges on the first day of trial, and the severance meant that he could not use the only

physical evidence in the case. Trial counsel said that, after the severance, he still believed that the petitioner could get a fair trial, until the trial judge allowed the state to introduce the bathroom tape of the petitioner through the "back door." Once the bathroom tape was in, trial counsel believed that the petitioner's "fate was sealed because that should never have been allowed." Trial counsel said that he complained to the media about the trial judge, which led to the trial judge filing a complaint against him.

Trial counsel testified that he met with the petitioner fifteen to twenty times prior to trial. He developed a list of questions that he would ask the petitioner on direct examination; he also tried to anticipate what the state would ask on cross-examination. Trial counsel went through the list of questions with the petitioner and gave the petitioner a printout of the questions. After the state played the audiotaped conversation between the petitioner and the victim at trial, trial counsel and the petitioner discussed the circumstances around the conversation. Trial counsel said that the petitioner was in court when the state played the audiotape for the jury. Trial counsel testified that, at the time of trial, he felt that he had adequately prepared the petitioner for his testimony both on direct and cross-examination. Trial counsel said that the petitioner was "combative," so he tried to advise the petitioner to be less intense.

Trial counsel testified that, in hindsight, he should have objected to the state's voice stress analysis questions on a basis other than relevancy. He agreed that the appellate court ruled that the improper cross-examination was not reversible error because "the improper cross-examination neither affirmatively appear[ed] to have affected the result of the trial on the merits nor involve[d] a substantial right of the [petitioner]."

On redirect examination, trial counsel agreed that the appellate court had concluded that there was no plain error in the trial court's questioning of the victim because the record did not clearly establish what happened at trial, specifically at a bench conference held prior to the victim's testimony.

David August Boto testified that he is currently general trial counsel for the Executive Committee of the Southern Baptist Convention. Before coming to Nashville, he was administrative trial counsel to the Texas District County Attorneys Association and an elected prosecutor in Texas. He testified that he is familiar with the jury trial system. Mr. Boto was present at the petitioner's trial originally because his son was subpoenaed to testify, but he continued attending because he was interested in the proceedings. He recalled that members of the public were asked to move to an area of the courtroom where they could not see a screen, and the jury was present when the spectators moved. Mr. Boto testified that his immediate response to the spectator shift was "that it portended that the content of the film

would be some sort of smoking gun; that there would be some . . . licentious sort of content." He said that he had never seen a similar shift before.

On cross-examination, Mr. Boto testified that his son, Matt Boto, had been subpoenaed to testify by the petitioner, but trial counsel did not call him to the stand. Matt was friends with the petitioner through his involvement in gymnastics. Mr. Boto said that he was not present for the entire trial. He had personally known the petitioner for less than five years at the time of trial. Mr. Boto contributed monetarily to the petitioner's defense after the trial was over.

The petitioner tendered Dr. Edmond Yabut as an expert in emergency medicine and pediatrics. Dr. Yabut testified that presence of pain is an objective symptom, while the degree of pain is subjective. He said that a patient reporting pain would generally exhibit "corresponding medical evidence." Dr. Yabut identified the victim's medical report from Our Kids Center and testified that the victim reported pain when the petitioner touched her, but her physical examination did not reveal evidence of injury. Specifically, Dr. Yabut testified that the exam showed that the victim's hymen was intact with no sign of damage. He said that he would expect a young victim, who reported months of painful sexual assault, to exhibit signs of trauma around the hymen, specifically "furrowing . . . tears or clefts around the edges." He said that a young girl could receive hymenal injuries that were not associated with sexual assault, for example, from bicycle injuries. The victim's medical report reflected a normal medical exam. Dr. Yabut opined that a normal medical exam would not "be consistent with a young patient's claim that she's been painfully sexually assaulted [twenty] to [thirty] times." He further opined that the victim was not "painfully sexually assaulted over a period . . . of several months."

On cross-examination, Dr. Yabut testified that his daughter took gymnastics lessons from the petitioner, and he contributed both towards the petitioner's bond and lawyer fees. Dr. Yabut testified that fondling the labia without entering the vaginal vault should not cause injury or pain. He said that he did not know that penetration in the legal sense included penetrating the labia. Dr. Yabut agreed that the victim reported that "it hurt a little when [the petitioner's] fingers touched her private spot . . . ." She also reported that she was unsure whether or not his fingers went inside her body, and she did not say how much force was used. Dr. Yabut agreed that the child could have experienced pain if force was used without having resultant injuries. He further agreed that the report did not mention repeated painful penetration.

Following the hearing, the post-conviction court rendered a memorandum opinion on October 20, 2008, denying post-conviction relief. The court found trial counsel deficient in five areas: (1) failing to object to the "spectator shift"; (2) failing to object to the trial court's

impeachment of the petitioner; (3) failing to object to the trial court's bolstering the credibility of the victim and her mother; (4) failing to prepare the petitioner for cross-examination regarding the audiotaped conversation and failing to listen to the tape before trial; and (5) failure to move for a mistrial after the trial court allowed the state to question the petitioner about voice stress analysis. The court found that trial counsel had tactical reasons for not objecting to the trial court's questioning of Ms. Fox and Ms. Thompson and to the state's use of the term "vaginal shots." The court further found that Dr. Yabut's testimony would not have amounted to substantive evidence of the petitioner's innocence, and therefore, trial counsel was not deficient in failing to provide a proper foundation for his testimony. The post-conviction court, however, determined that the petitioner did not carry his burden of showing that trial counsel's deficient representation prejudiced the defense. The court stated that the victim's testimony was "extremely powerful," while the petitioner's testimony was evasive and did not explain the videotapes or audiotape.

## Analysis

On appeal, the petitioner contends that his trial counsel rendered ineffective assistance of counsel and that he was prejudiced by trial counsel's deficient representation. Specifically, the petitioner argues that trial counsel was ineffective in the following instances: (1) failing to object to the "spectator shift;" (2) failing to object to the trial court's impeachment of the petitioner; (3) failing to obtain a copy of the audiotaped conversation, to object to its admission, and to prepare the petitioner for cross-examination about it; (4) failing to properly object to the state's improper cross-examination of the petitioner regarding voice stress analysis and to move for a mistrial; (5) failing to lay a proper foundation for expert medical testimony and admission of the victim's medical report; (6) failing to object to the trial court's questioning of the victim; (7) failing to object to the trial court's questioning of state's witnesses; (8) failing to seek an extraordinary appeal after the trial court refused to compel the state to copy videotape evidence; and (9) failing to object to the term "vaginal shots." The petitioner further argues that the cumulative effect of trial counsel's errors prejudiced the petitioner. The state responds that trial counsel's representation was not deficient. We find that the petitioner's claims are without merit.

## Standard of Review

In order for a petitioner to succeed on a post-conviction claim, the petitioner must prove the allegations set forth in his petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). On appeal, this court is required to affirm the post-conviction court's findings unless the petitioner proves that the evidence preponderates against those findings. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). Our review of the post-conviction court's factual findings is *de novo* with a presumption that the findings are correct. *Fields v. State*,

40 S.W.3d 450, 457-58 (Tenn. 2001). Our review of the post-conviction court's legal conclusions and application of law to facts is *de novo* without a presumption of correctness. *Id.*

To establish ineffective assistance of counsel, the petitioner must show that (1) trial counsel's performance was deficient and (2) the deficient performance prejudiced the defense rendering the outcome unreliable or fundamentally unfair. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Arnold v. State*, 143 S.W.3d 784, 787 (Tenn. 2004). Deficient performance is shown if trial counsel's conduct fell below an objective standard of reasonableness under prevailing professional standards. *Strickland*, 466 U.S. at 688; *see also Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975) (establishing that representation should be within the range of competence demanded of attorneys in criminal cases). Prejudice is shown if, but for trial counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694. If either element of ineffective assistance of counsel has not been established, a court need not address the other element. *Id.* at 697; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Also, a fair assessment of trial counsel's performance, "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of trial counsel's challenged conduct, and to evaluate the conduct from trial counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). The fact that a particular strategy or tactical decision failed does not by itself establish ineffective assistance of counsel. *Goad*, 938 S.W.2d at 369. However, deference is given to strategy and tactical decisions only if the decisions are informed ones based upon adequate preparation. *Id.* (citations omitted).

## 1. Spectator Shift

The petitioner contends that trial counsel provided ineffective representation at trial when he did not object to, and in fact participated in, the trial court's order that spectators in the gallery move so they could not see the videotapes that the jury was viewing. Specifically, the petitioner argues that trial counsel's performance was deficient because he did not preserve the issue for appeal, resulting in waiver of the issue, and did not consider the impact on the jury. He further argues that trial counsel's deficient performance prejudiced the petitioner by positing that this court would have found that the spectator shift constituted a closure of the court, in violation of the right to public trial, and ordered a reversal and new trial. Additionally, the petitioner contends that the spectator shift poisoned the jury against him because the trial court was, in effect, "saying that the videos taken by the [petitioner] of the alleged victim were so horrible that normal people cannot even see it . . . ." The state responds that trial counsel made a reasonable, tactical decision, and his decision did not prejudice the defense.

At the post-conviction hearing, trial counsel testified that, at the time the videotapes were introduced, he believed the petitioner would be acquitted. He was concerned with the impact that the videotapes would have on the petitioner's business interests if the media showed the tapes out of context, so he made the decision not to object to the gallery shift. In our view, trial counsel made a reasonable, professional decision at that time. Further, a fair assessment of trial counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of trial counsel's challenged conduct, and to evaluate the conduct from trial counsel's perspective at the time." *Strickland*, 466 U.S. at 689. The petitioner's argument on this issue is without merit.

### 2. Instruction to Jury to Disregard Statement Made by the Petitioner

The petitioner argues that trial counsel provided ineffective assistance when he did not object to the trial court's "improper impeachment" of the petitioner. Specifically, the petitioner contends that the trial court instructed the jury to disregard a truthful statement the petitioner made during his testimony, which amounted to a comment on the evidence that should have drawn an objection from trial counsel. The state responds that trial counsel's decision was professionally reasonable and that the petitioner was not prejudiced by the failure to object because the trial court acted within its discretion. We agree with the state.

The state constitution forbids judges from instructing juries on the facts of the case. Tenn. Const. art. VI, § 9. "In all cases the trial judge must be very careful not to give the jury any impression as to his feelings or to make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury." *State v. Suttles*, 767 S.W.2d 403, 406-07 (Tenn. 1989). In this case, the record reflects that, when asked whether he had seen the videotapes, the petitioner stated, "I was unable to look at the videotapes in their entirety because of the strict rules that the Court put on us." *Schiefelbein*, 230 S.W.3d at 117. During a jury-out hearing on another matter, the trial court suggested instructing the jury to disregard the statement as unresponsive and explained that "the court of appeals may assume that's true because he wasn't corrected on the record." *Id.* Trial counsel then agreed to the instruction, with the caveat that he was not waiving his objection to the trial court's orders concerning discovery of the videotapes. The trial court later instructed the jury "to disregard any comment that the defendant made in his testimony concerning any alleged denial of access to tapes by the Brentwood Police Department prior to today." *Id.* This court has held that a trial court's instruction to disregard a defendant's unresponsive testimony is not an improper comment on the evidence. *State v. Elroy D. Kahanek*, No. 01C01-9707-CC-00298, 1998 WL 345356, at *6 (Tenn. Crim. App., June 30, 1998), *perm. app. denied* (Tenn., Jan. 11, 1999). We are not persuaded that the trial court's instruction constituted an improper comment on the evidence that might have swayed the jury. Because the instruction was

proper, trial counsel's performance was professionally reasonable, and the petitioner is not entitled to relief on this issue.

### 3. Audiotape

The petitioner next argues that trial counsel's performance was deficient because he did not obtain a copy of the audiotaped conversation between the petitioner and the victim, did not listen to the audiotape before trial, did not object to the admission of the audiotape, and did not prepare the petitioner for cross-examination about the audiotape. He further contends that trial counsel's deficient performance prejudiced him because the state effectively impeached him on cross-examination. The state responds that trial counsel's performance was reasonable considering he requested a copy of the audiotape that the state did not turn over. The post-conviction court found, as a matter of fact, that trial counsel did not listen to the audiotape prior to trial. The court concluded that trial counsel's performance was deficient but did not prejudice the petitioner. We agree with the post-conviction court.

The rules of criminal procedure require the state to provide copies of documents and objects, at the defendant's request, that are material to the defense, that the state plans to introduce in its case-in-chief, or that belong to the defendant. Tenn. R. Crim. P. 16(a)(1)(F). Rule sixteen further proscribes that

> [i]f a party fails to comply with this rule, the court may:
>
> (A) order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms or conditions;
>
> (B) grant a continuance;
>
> (C) prohibit the party from introducing the undisclosed evidence; or
>
> (D) enter such other order as it deems just under the circumstances.

Tenn. R. Crim. P. 16(d)(2). Trial counsel testified at the post-conviction hearing that he requested a copy of the audiotape and was under the impression that he would receive a copy before the trial began. Trial counsel's testimony was inconsistent about whether he heard the tape before trial or heard it for the first time at trial. The post-conviction court found that he did not hear it until trial, and the record does not preponderate against that finding. Trial counsel did not take any action to ameliorate the state's failure to comply with the discovery request. Because the audiotape was a key piece of evidence against the petitioner, trial counsel's failure to obtain a copy or mitigate the state's discovery violation constitutes deficient performance.

-35-

The petitioner, however, has not carried his burden of showing prejudice. As this court has previously said,

> the customary need for a copy of the audio cassette recording is to permit a comparison with the transcript that the [s]tate intends to offer at trial. In that fashion, any transcription inaccuracies or disputes can be resolved pretrial. In the present case, the defense does not point to any such inaccuracies with the [s]tate's furnished transcript or other specific prejudice warranting relief on appeal.

*Schiefelbein*, 230 S.W.3d at 113. As for the state's cross-examination about voice inflection, the petitioner had the opportunity to hear the audiotape during Detective Breedlove's testimony, several days prior to his own testimony, and the petitioner had a "combative" nature that did him no favors when subjected to a rigorous cross-examination. More importantly, the jury heard the tape and came to its own conclusions as to the credibility of the petitioner. We conclude that trial counsel's deficient performance regarding the audiotape did not render the outcome of the proceedings unreliable; therefore, the petitioner is not entitled to relief on this issue.

### 4. Voice Stress Analysis

The petitioner contends that trial counsel provided ineffective assistance by not successfully objecting to or moving for a mistrial when the state questioned the petitioner about voice stress analysis. The state responds that trial counsel's performance was professionally reasonable and that trial counsel made a tactical decision to not move for a mistrial after his objection was overruled.

The record shows that the state asked the petitioner whether he was familiar with voice stress analysis and if he was "aware that people can take a recording like this and determine whether or not someone is under stress, similar to that of a lie detector?" *Schiefelbein*, 230 S.W.3d at 133. Trial counsel objected on relevance grounds, and the trial court overruled the objection. *Id.* In the direct appeal on this matter, this court stated that "the [s]tate's cross-examination was misleading, factually incorrect, and irrelevant; it should not have been allowed." *Id.* at 134. However, this court did not find reversible error, stating that the cross-examination did not affect the outcome of the trial. *Id.* Whether or not trial counsel's performance was deficient, we conclude that the petitioner has failed to show how any error by trial counsel resulted in prejudice to the defense because, as this court previously found, the outcome of the proceeding was not affected by the improper questioning. The petitioner is therefore not entitled to relief on this issue.

*5. Foundation for Medical Testimony*

The petitioner argues that trial counsel provided ineffective assistance by not laying the proper foundation for the admission of Dr. Yabut's expert medical testimony and the victim's medical report. He contends that trial counsel's error prejudiced his defense by depriving him of the opportunity to present substantive evidence of his innocence, namely that the "victim's accusations were medically impossible . . . ." The state responds that trial counsel made an offer of proof that was rejected by the trial court and cannot be "deemed deficient for the trial court's error in excluding the proffered evidence." We agree with the state.

On direct appeal, this court found that the trial court committed harmless error by not admitting Dr. Yabut's testimony because the testimony was "marginally relevant" to rebut Ms. Thompson's testimony that the victim reported experiencing pain. *Schiefelbein*, 230 S.W.3d at 123. The trial court also committed harmless error in not admitting the medical report because the report "neither confirmed or ruled out the possibility of any type of sexual contact." *Id.* The petitioner avers, however, that if trial counsel had properly laid a foundation for the admission of the medical report and testimony by calling the nurse who took the report, then Dr. Yabut's expert testimony would have been relevant to the petitioner's guilt or innocence rather than have value only for impeachment. The post-conviction court, after hearing Dr. Yabut's testimony, found that his testimony did not constitute substantive evidence of innocence, and the record does not preponderate against the court's finding. The medical report was inconclusive, and at the post-conviction hearing, the state elicited from Dr. Yabut that the child could have experienced pain without injuries if enough force was used. We conclude that the outcome of the proceedings was not affected by the absence of Dr. Yabut's testimony and the medical report; therefore, the petitioner has not shown prejudice and is not entitled to relief on this issue.

*6. Trial Court's Examination of Witnesses*

The petitioner argues that trial counsel provided ineffective assistance by not objecting to the trial court's questioning of witnesses.[15] He contends that the questioning amounted to improper comments on the evidence. The state avers that trial counsel made a reasonable, tactical decision not to object.

The petitioner argued on appeal that the trial court's questioning of the witnesses impermissibly bolstered their credibility. This court summarized the law as follows:

> The Tennessee Constitution prohibits judges from making any comment "with respect to matters of fact." Tenn. Const. art. VI, § 9; *State v. Suttles,* 767

---

[15] We combine the petitioner's issues six and seven as the same law applies to each.

S.W.2d 403, 406 (Tenn. 1989). The aim of this rule is to avoid giving "the jury any impression as to [the judge's] feelings or to make any statement which might reflect upon the weight or credibility of evidence or which might sway the jury." *Suttles*, 767 S.W.2d at 407; *see State v. Brown,* 823 S.W.2d 576 (Tenn. Crim. App. 1991). "It is natural that jurors should be anxious to know the mind of the Court, and follow it; therefore, a Court cannot be too cautious in [its] inquiries." *McDonald v. State,* 89 Tenn. 161, 164, 14 S.W. 487, 488 (Tenn. 1890).

That said, our Tennessee Rules of Evidence specifically permit the interrogation of witnesses by the trial judge:

(b) Interrogation by Court. The Court may interrogate witnesses.

(c) Objections. Objections . . . to interrogation by [the court] may be made at the time or at the next available opportunity when the jury is not present.

Tenn. R. Evid. 614(b), (c). So long as the inquiry is impartial, trial courts may ask questions to either clarify a point or to supply any omission. *See Collins v. State,* 220 Tenn. 275, 416 S.W.2d 766 (Tenn. 1967); *Parker v. State,* 132 Tenn. 327, 178 S.W. 438 (Tenn. 1915). Also, our rules entrust to the trial court the power to "exercise appropriate control over the presentation of evidence and conduct of the trial when necessary to avoid abuse by trial counsel." Tenn. R. Evid. 611(a).

*Schiefelbein*, 230 S.W.3d at 117-18.

*Victim*. The record reflects that the trial court asked the victim whether she had made up any of her accusations or had been coached to make the accusations. This court, in the direct appeal, found the issue waived because trial counsel did not object and did not find plain error because the trial record was incomplete. We note, however, that in disqualifying the trial judge from further proceedings in this matter, this court referred to "the judge's credibility-bolstering examination of the victim-witness, though itself unworthy of a reversal." *Id.* at 137. In the post-conviction hearing, trial counsel testified that he did not object because he believed the questioning was proper and would have asked the same questions. In our view, whether or not the questions bolstered the victim's credibility, trial counsel's testimony reflects that he made a reasoned decision not to object; therefore, we find that his performance was not deficient. Additionally, the petitioner faults trial counsel for not properly preparing the trial record so that this court could not complete a plain error

review. However, the onus of preparing the record is placed on the appellant. Tenn. R. App. P. 24(b); *see also State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App., 1991). Trial counsel did not represent the petitioner on appeal, and we decline to charge him with the responsibility of preparing the appellate record. Because we conclude that trial counsel's performance was not deficient, the petitioner has not met his burden and is not entitled to relief on this issue.

*Victim's mother.* The record reflects that the trial court allowed the jury to submit questions, which trial counsel and the assistant district attorney general read silently and made no objection. *Schiefelbein*, 230 S.W.3d at 120-21. The petitioner claimed on appeal that the last question, whether the victim's mother knew if the victim had told her story to her friends, constituted an improper comment on the evidence by the trial court. In reviewing for plain error, this court found that "this contention provide[d] no basis for a reversal because the question did not amount to a judicial comment and did not adversely affect the defendant's rights." *Id.* at 121. In his post-conviction appeal, the petitioner again claims that the question amounted to a comment on the evidence, bolstering the victim's credibility by allowing the jury "to consider it for the proposition that the 'story' shared by the alleged victim was, in fact, true." However, as this court has previously found that the question was not a comment on the evidence and did not prejudice the petitioner, we decline to find prejudice now. The petitioner is therefore not entitled to relief on this issue.

*Ms. Fox.* The trial court asked the state's gymnastics expert, Ms. Fox, whether parental consent was required to film participants, to which she responded that parental consent was not required for legitimate training videos. *Schiefelbein*, 230 S.W.3d at 120. At the post-conviction hearing, trial counsel testified that Ms. Fox's answer supported the defense theory that the petitioner legitimately filmed the gymnasts for training. Based on trial counsel's testimony, we find that he made a tactical decision not to object and that his performance was not deficient regarding this issue. The petitioner's argument is without merit.

*Ms. Thompson.* The trial court asked Ms. Thompson, a social worker with the Our Kids Center, how many times the victim used the word "pain" in her report. On appeal, the petitioner argued that the trial court's question amounted to an improper comment on the evidence, but this court, reviewing for plain error, found that "the question was cumulative and did not adversely affect the [petitioner]'s rights." *Id.* Trial counsel testified at the post-conviction hearing that he wanted Ms. Thompson to discuss "pain" because that supported the defense theory that the victim's report of pain was inconsistent with the medical findings. His strategy was to have Dr. Yabut testify to the inconsistency, but the trial court would not allow that testimony. The failure of a defense strategy does not, by itself, establish

ineffective assistance of counsel. *Goad*, 938 S.W.2d at 369. We conclude that trial counsel's performance was not deficient, and the petitioner is not entitled to relief on this issue.

## 7. *Extraordinary Appeal*

The petitioner argues that trial counsel provided ineffective assistance by not seeking an extraordinary appeal after the trial court denied the defense's request for an interlocutory appeal of the trial court's decision to require the defense to view the videotape evidence at the Brentwood Police Department. The state responds that trial counsel made a tactical decision to forego an extraordinary appeal.

The Tennessee Rules of Appellate Procedure allow parties to apply to an appellate court for an extraordinary, discretionary appeal of a lower court's interlocutory order "if the lower court has so far departed from the accepted and usual course of judicial proceedings as to require immediate review." Tenn. R. App. P. 10(a)(1). When the petitioner argued on appeal that the trial court's discovery restrictions constituted reversible error, this court determined that the restrictions were error. However, the petitioner did not show that the restrictions were harmful enough to merit reversal. At the post-conviction hearing, trial counsel testified that he moved the trial court to compel the state to copy the videotapes, and when the trial court denied that motion, he requested an interlocutory appeal, which the trial court likewise denied. He stated that he did not seek an extraordinary appeal because he believed this court would not grant relief due to the fact that he had access to the videotapes. We find that trial counsel made a tactical decision not to pursue an extraordinary appeal and was not deficient in this regard. The petitioner is therefore not entitled to relief on this issue.

## 8. *State's Use of the Term "Vaginal Shots"*

The petitioner contends that trial counsel provided ineffective assistance by not objecting to the state's repeated use of the term "vaginal shots" in reference to the close-up shots of the victim in the videotapes. The state responds that trial counsel made a tactical decision not to object. We agree with the state. At the post-conviction hearing, trial counsel testified that he believed the term was "proper and fair." Trial counsel stated that he did not believe the term went against the defense theory that the petitioner made the videotapes for legitimate training purposes. Trial counsel's testimony evinced that he made a tactical decision. We conclude, therefore, that trial counsel's performance was not deficient in this regard. The petitioner is not entitled to relief on this issue.

## 9. *Cumulative Error*

The petitioner lastly argues that he received the ineffective assistance of counsel based on cumulative error. In light of our previous determinations, this issue is without merit.

## Conclusion

For the foregoing reasons, we conclude that the petitioner's allegations of ineffective assistance of counsel are without merit. Accordingly, the judgment of the post-conviction court is affirmed.

_____
J.C. McLIN, JUDGE